T.C. Memo. 2000-234

UNITED STATES TAX COURT

LOUIS J. NOVAK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6457-98.                    Filed August 2, 2000.

<u>Michael D. McPhillips</u> and <u>Terry W. Vincent</u>, for petitioner.

<u>Anita A. Gill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1993 | $17,654 |
| 1994 | 19,723 |
| 1995 | 39,061 |

The sole issue for decision[1] is whether petitioner's breeding, training, and showing of Arabian horses was an activity engaged in for profit within the meaning of section 183.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Newbury, Ohio, at the time he filed his petition.

Petitioner has been a practicing radiation oncologist since 1975. As a radiation oncologist, petitioner regularly works between the hours of 7 or 8 o'clock in the morning to 5 or 6 o'clock in the evening, 5 days a week. He is also on the faculty of University Hospital and is on call from the hospital approximately 1 out of 4 to 5 weeks. In addition, petitioner is on call 24 hours a day, 7 days a week for his own practice. Petitioner practiced radiation oncology as an employee of University Radiologists of Cleveland. During the 22 years that petitioner was employed by University Radiologists, petitioner served on its board of directors. During the years 1986 through

---

[1]The notice of deficiency contains adjustments to petitioner's itemized deductions and claimed exemption allowances for the years in issue. These are computational adjustments which will be affected by the outcome of the issue to be decided, and we do not separately address them.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

1997, petitioner received the following wage income from University Radiologists:

| Year | Wages |
|------|-------|
| 1986 | $156,461 |
| 1987 | 278,749 |
| 1988 | 218,365 |
| 1989 | 232,952 |
| 1990 | 232,715 |
| 1991 | 207,880 |
| 1992 | 183,496 |
| 1993 | 188,496 |
| 1994 | 217,925 |
| 1995 | 223,957 |
| 1996 | 230,209 |
| 1997 | 219,400 |
| Total | 2,590,605 |

Petitioner owned University Imaging, Inc., an S corporation, from 1988 through 1997. During the years in issue, he reported the following income from University Imaging:

| Year | Income |
|------|--------|
| 1993 | $17,252 |
| 1994 | 18,850 |
| 1995 | 23,795 |
| Total | 59,897 |

Petitioner first worked on a horse farm and learned how to ride horses while in high school. Petitioner developed a fondness for horses but was unable to engage in horse-related activities while he was in college.[3] After college, petitioner

---

[3]Petitioner testified that while he was in college, his friends sent him little bags of horse manure so that he could "smell the horses".

attended medical school so that he could earn sufficient income to "do something with horses".[4]

Petitioner began his breeding activity in 1970 by breeding an Arabian stallion and then changed his breeding activity in 1976 to the breeding of Arabian mares. Also in 1976, petitioner bought his first parcel of real estate and built a small barn on it.

In 1986, petitioner purchased a 78.5-acre parcel of real estate in Newbury, Ohio, for $222,899. After acquiring the property, petitioner paid between $25,000 and $30,000 to refurbish the existing house, $30,000 to build a three-car garage, $40,000 to create a lake, $20,000 to build an exercise pen, approximately $20,000 to build run-in sheds, and between $8,000 and $10,000 to build stalls. Petitioner resided on the Newbury, Ohio, property during the years in issue.

Petitioner's 1986 Federal income tax return reported income and deductions relating to the breeding, training, and showing of

---

[4]Petitioner testified:

> My father was a banker and had raised four kids, helped and supported my brother and I to do the horse activities that we were interested in as high school students, and I initially thought I was going to become a school teacher, and my father said, if you ever want to have horses, you can't be a school teacher, you've got to find a job where you can make some money, be a doctor or a dentist, and so, I decided I would go to medical school so that I could make a decent living and continue to do something with horses, that I realized required a considerable amount of money.

Arabian horses on Schedule C, Profit or Loss From Business, under the business name "Louis J. Novak".  For the years 1987 through 1997, petitioner reported income and deductions relating to his Arabian horse activity on Schedule C under the business name "Arabian Crossings Farm" or "Arabian Crossings".

During the years 1986 through 1997, petitioner's horse activity was reported on Schedule C as having incurred losses as follows:

| Year | Gross Receipts | Cost of Goods Sold | Gross Income | Schedule C Expenses Other Than Depreciation | Depreciation | Schedule C Loss |
|------|------|------|------|------|------|------|
| 1986 | $32,200 | -0- | $32,200 | $78,976 | $39,931 | ($86,707) |
| 1987 | 16,870 | -0- | 16,870 | 78,478 | 42,723 | (104,331) |
| 1988 | 13,644 | -0- | 13,644 | 66,657 | 44,875 | (97,888) |
| 1989 | 8,833 | $4,320 | 4,513 | 76,485 | 24,338 | (96,310) |
| 1990 | 12,176 | 7,390 | 4,786 | 90,917 | 28,379 | (114,510) |
| 1991 | 12,695 | 6,100 | 6,595 | 94,383 | 29,279 | (117,067) |
| 1992 | 4,309 | 6,018 | (1,709) | 52,774 | 31,760 | (86,243) |
| 1993 | 3,452 | 5,825 | (2,373) | 55,588 | 27,711 | (85,672) |
| 1994 | 3,250 | 6,566 | (3,316) | 49,265 | 28,039 | (80,620) |
| 1995 | 3,625 | 13,629 | (10,004) | 60,003 | 27,580 | (97,587) |
| 1996 | 3,105 | 18,877 | (15,772) | 65,138 | 24,786 | (105,696) |
| 1997 | 1,688 | 6,290 | (4,602) | [1]106,068 | 21,080 | (131,750) |
| Total | 115,847 | 75,015 | 40,832 | 874,732 | 370,481 | (1,204,381) |

[1]Petitioner also owed Stachowski Farms approximately $20,000 in unpaid boarding/training bills as of Dec. 31, 1997.

No sales of horses were included in Schedule C gross receipts for the years in issue.  Reported gross receipts for the years in issue consisted entirely of prize winnings.  It does not appear that any of the "gross receipts" that petitioner reported from 1986 through 1992 and 1996 through 1997 included the sale of horses that he bred.  For each of those years, petitioner reported the sale of horses on Form 4797, Gains and Losses From Sales or Exchanges of Assets Used in a Trade or Business and Involuntary Conversions.

For the years 1989 through 1997, "cost of goods sold" shown on petitioner's Schedule C consisted entirely of labor.  Since petitioner's gross receipts reported on Schedule C for the years in issue consisted entirely of prize money, the characterization of labor as cost of goods sold is questionable.

In 1996, petitioner reported $3,105 in gross receipts and cost of goods sold of $18,877.  The entire $18,877 in reported cost of goods sold consisted of reported labor cost.  The $18,877 in reported labor cost represented a 38.5-percent increase over reported labor cost in 1995, while reported gross receipts dropped 14.34 percent.  Of the $18,877 in reported labor cost, $12,980 consisted of wages paid to Alan Dahart.  Mr. Dahart is a personal friend who lives with petitioner.

From 1986 through 1997, petitioner reported the following income from the sale of horses on Form 4797:[5]

| Year | Gross Sales Price | Previously Allowed Depreciation | Cost[1] | Gain/Loss[2] |
|------|------|------|------|------|
| 1986 | $10,000 | $3,150 | ($10,500) | $2,650 |
| 1986 | 3,000 | -0- | (3,000) | -0- |
| 1988 | 25,000 | 11,000 | (25,000) | 11,000 |
| 1988 | 42,000 | -0- | (26,500) | 15,500 |
| 1989 | 2,500 | -0- | -0- | 2,500 |
| 1989 | 5,000 | 2,898 | (3,216) | 4,682 |
| 1989 | 36,986 | 70,399 | (118,710) | (11,325) |
| 1989[4] | 15,000 | 42,250 | (50,000) | 7,250 |
| 1990 | 1,500 | 6,375 | (8,500) | (625) |
| 1990-1991 | 3,000 | -0- | -0- | [3]3,000 |
| 1991 | 3,480 | 6,300 | (7,000) | 2,780 |
| 1992 | 54,500 | 1,250 | (32,125) | 23,625 |
| 1993 | 15,000 | 11,900 | (17,000) | 9,900 |
| 1994 | 2,500 | -0- | -0- | 2,500 |
| 1997 | 50,000 | 1,275 | (5,025) | 46,250 |
| Total | 269,466 | 156,797 | (306,576) | 119,687 |

[1]Includes petitioner's cost or other basis, plus expense of sale.
[2]Petitioner's gains and losses were determined by adding the gross sales price and depreciation and then subtracting petitioner's cost or other basis and selling cost.
[3]The sale was reported on the installment method. Accordingly, $800 was recognized in 1990 and $2,200 was recognized in 1991.
[4]The horses that petitioner sold after 1989 were bred by him.

For 1992, $29,625 of the $32,125 in cost reported by petitioner is commission paid on the sale of three horses. Mr. Dahart was paid $22,500 in commission on those three sales.

_____

[5]For the years in issue, petitioner reported the sale of horses on part I of Form 4797, Gains and Losses From Sales or Exchanges of Assets in a Trade or Business and Involuntary Conversion. The instructions for Form 4797 for those years provide the following: Sec. 1231 transactions include "Sales or exchanges of cattle and horses, regardless of age, used in a trade or business by the taxpayer for draft, breeding, dairy, or sporting purposes and held for 24 months or more from acquisition date."

The average commission a seller pays on the sale of a horse is 10 to 15 percent of the sales price. Petitioner paid commissions of 10 to 15 percent to persons other than Mr. Dahart. Nevertheless, petitioner paid commissions to Mr. Dahart that were as high as 50 percent. Petitioner provided no explanation for the above-average commissions paid to Mr. Dahart. Petitioner paid Mr. Dahart commissions[6] on the following sales:

| Year of Sale | Horse | Sales Price | Commission | Percentage of Sales Price |
|---|---|---|---|---|
| 1990 | Dance with Fire | $3,000 | $1,275 | 42.5% |
| 1992 | Pro Gato | 47,500 | [1]19,000 | 40.0% |
| 1992 | La Quintina | 2,000 | 1,000 | 50.0% |
| 1992 | Lucy in Disguise | 5,000 | 2,500 | 50.0% |
| | | 57,500 | 23,775 | 41.35% |

[1]Petitioner also paid Stachowski Farms a $7,125 (15-percent) commission on this sale. Combining the commission paid to Mr. Dahart and to Stachowski Farms, petitioner paid a 55-percent commission on the sale of Pro Gato.

During the years in issue, petitioner owned the following horses:

Horse
Staleys Mahgelo
Labamba[1]
Crystal Aere
Marranda
Bint Quintina
New Foundation
Louisville
Morocco Grande
PF Private Reserv[2]
Apaladin[3]

[1]Sold in 1994.
[2]Sold in 1993.
[3]Born in 1994.

During the years in issue, petitioner maintained a separate checking account for his horse activity under the name "Arabian

[6]Petitioner also began paying Mr. Dahart a salary starting in 1996.

Crossings". Petitioner used separate letterhead and business cards for the horse activity that bore the name "Arabian Crossings". Mr. Dahart's name appears on both the letterhead and business cards along with petitioner's name. Mr. Dahart did not own any interest in petitioner's horses.

Petitioner has not prepared a written business plan for his horse activity, nor has he prepared a written analysis to determine how he could make a profit or what he would have to do to break even. Petitioner has not consulted with persons with expertise regarding the financial aspects of his horse activity.

OPINION

The sole issue for decision is whether petitioner's breeding, training, and showing of Arabian horses activity is an activity not engaged in for profit. Section 183(a) provides that if a taxpayer's activity constitutes an activity not engaged in for profit, expenses arising out of the activity are allowed as deductions only as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 generally permits the deduction of expenses incurred in a trade or business, and paragraphs (1) and (2) of section 212 generally permit a similar deduction for expenses incurred "for the

production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income".

For a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary purpose and dominant intent of realizing a profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987);[7] Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. T.C. Memo. 1988-310; Godfrey v. Commissioner, 335 F.2d 82, 84 (6th Cir. 1964), affg. T.C. Memo. 1963-1; see also Warden v. Commissioner, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997). In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent. See sec. 1.183-2(a), Income Tax Regs.

Section 183(d) provides a rebuttable presumption that an activity will be an activity engaged in for profit if the gross income from the activity exceeds the deductions attributable to the activity for 3 or more of the taxable years in a 5-year period. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, "2" is

---

[7]"We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

substituted for "3" and "7" for "5". Petitioner has never reported a profit from his horse activity.

Section 1.183-2(b), Income Tax Regs., sets forth some relevant factors for determining whether an activity is engaged in for profit. The relevant factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Not all of these factors are applicable in every case, and no one factor is controlling. See sec. 1.183-2(b), Income Tax Regs.

We now apply each of these factors to the facts in this case.

(1) <u>Manner in Which the Taxpayer Carries on the Activity</u>

Petitioner argues that his actions evidenced a business plan and cites <u>Phillips v. Commissioner</u>, T.C. Memo. 1997-128. In <u>Phillips</u>, the taxpayers had a business plan. They calculated the costs per horse, per month. They estimated when their horse

activity would become profitable. They performed a detailed analysis of their horse activity. Petitioner did not have such plans. He has not prepared a profit plan for his horse activity. He did not prepare any written analysis in order to determine how he could make a profit or what he would have to do to break even. Petitioner has not consulted with persons with expertise regarding the financial aspects of his horse activity. Petitioner testified that his current goal is to continue his horse activity but to do so more efficiently. Petitioner admitted at trial that he will never be able to recoup what he has spent on his activity thus far.

Some of petitioner's actions seem to run contrary to a profit objective. Petitioner testified that the average commission paid on the sale of a horse is 10 to 15 percent, and that is what he would pay to persons other than Mr. Dahart. Petitioner testified that he would pay Mr. Dahart commissions as high as 50 percent. When petitioner sold La Quintina and Lucy in Disguise, he paid Mr. Dahart a 50-percent commission on each sale. When petitioner sold Pro Gato[8] for $47,500, he paid Mr. Dahart a $19,000 or 40-percent commission, and he also paid

---

[8]The contract was prepared on Arabian Crossings' letterhead that included both the names of petitioner and Alan Dahart. However, petitioner testified that he and Mr. Dahart did not jointly own any horses.

Stachowski Farms a $7,125 or 15-percent commission.  Petitioner paid commissions totaling 55 percent on the sale of Pro Gato.

Petitioner maintained a separate checking account for Arabian Crossings, and he initially testified that the account was not used for personal expenses.  However, checks were written for personal expenses.  For instance, petitioner used the Arabian Crossings' checking account on several occasions to send checks totaling $250 to his niece on her birthday, to pay for a personal trip to Las Vegas, and to pay veterinarian bills for a swan that he kept on his farm.  On the other hand, petitioner would pay Stachowski Farms[9] with his Visa credit card and then pay his Visa bills from his personal checking account.

Petitioner asserts that he promoted his Arabians by exhibiting them at shows and competitive events.  An examination of petitioner's Federal income tax returns for the years in issue indicates that petitioner deducted $31,429[10] in show costs and expenses[11] and reported $10,327[12] in gross receipts from prize

[9]Petitioner paid Stachowski Farms to board and breed some of his horses, and occasionally Stachowski Farms acted as agent for petitioner on the sale of some horses.

[10]During 1993, 1994, and 1995, petitioner deducted $10,609, $6,355, and $14,465, respectively, as show costs and expenses.

[11]Petitioner testified that show costs consist of entry fees, transporting horses to shows, and maintenance of the horses at the shows.

[12]Petitioner reported gross receipts for each year of
(continued...)

winnings.  Petitioner's participation in shows and equestrian events is as consistent with a hobby as it is a business.  See Golanty v. Commissioner, 72 T.C. 411, 430 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

(2)  The Expertise of the Taxpayer or His Advisers.

Petitioner argues that he became an expert in the Arabian horse-breeding business, read numerous periodicals pertaining to Arabian horses, participated in various Arabian horse-related organizations, and consulted with individuals whom petitioner considered to be experts in the field.  The mere fact that petitioner has skill in the breeding of horses and hired various experts does not prove that petitioner was engaged in his horse activity primarily for profit.  See Glenn v. Commissioner, T.C. Memo. 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996).  Expertise with respect to the breeding of horses is to be distinguished from expertise in the economics of these undertakings.  See id.; see also Golanty v. Commissioner, supra at 432.  A taxpayer's failure to obtain expertise in the economics of horse-related activities indicates a lack of profit motive.  See Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.  In this case, petitioner

---

[12](...continued)
$3,452, $3,250, and $3,625, respectively.

sought no professional advice on the economic aspects of the breeding, training, and showing of Arabian horses.

Petitioner is an intelligent person, and he has acquired a good deal of knowledge about Arabian horses and their breeding. However, such activity and knowledge are altogether consistent with his interest in a hobby, and he has failed to show that he sought or acquired the expertise that would enable him to turn the activity into a profitable business.

(3) <u>The Time and Effort Expended by the Taxpayer in Carrying on the Activity</u>.

Petitioner argues that he has organized his medical practice and his farm so that he can spend enough time to develop his Arabian horse activity. Petitioner devoted substantial time to his medical practice. The time and effort spent breeding horses was substantially less and was not inconsistent with the time one might expect to be devoted to a hobby from which the participant receives enjoyment and satisfaction.

(4) <u>Expectation That Assets Used in Activity May Appreciate in Value</u>.

Petitioner argues that he expects the assets used in his activity will appreciate in value. Petitioner did not estimate the value of his horses, and no expert testimony or other reliable evidence of value was introduced. Based on petitioner's reported sales of Arabian horses to date, he does not come close to covering his losses.

Petitioner did not establish that he purchased the real estate in Newbury, Ohio, with appreciation in mind, nor did he hold the property primarily with appreciation in mind. Petitioner testified that he intended to live and retire on the property. It was something that he wanted to keep. He did not express any desire to sell or profit from the property in order to offset or recoup his losses.

Petitioner lived on the Newbury, Ohio, property. To the extent there was any appreciation, much of it could have been attributable to the house that petitioner lived in. Based on this record, we are unable to separate the property used for the breeding, training, and showing of Arabian horses from petitioner's residential property.

(5) <u>The Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities</u>.

Petitioner has been quite successful as a doctor and was a shareholder in a profitable S corporation. Petitioner reported income totaling $59,897 from University Imaging during the years in issue. On the other hand, petitioner was not successful in his horse partnership Amanda Associates. Petitioner reported $16,900 in losses relating to the partnership on his Federal income tax returns from 1986 through 1990.[13]

---

[13]Petitioner had an interest in the partnership until 1990.

Petitioner argues that many years before he formed Arabian Crossings, he purchased a horse for $4,000 and sold it for between $20,000 and $25,000.[14]  Even if we accept this as true, petitioner has not proven that he did in fact make a profit on the sale of a horse prior to forming Arabian Crossings.  As the record shows, many expenses in addition to purchase price have to be factored into whether a transaction produced an overall profit.

(6)   The Taxpayer's History of Income or Losses With Respect to the Activity

Petitioner argues that the losses are due to expenses incurred in the startup phase of his activity.  As this Court stated in Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967):

> the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.

We are not convinced that the years in issue fall within what petitioner asserts is the startup phase of his breeding, training, and showing of Arabian horses activity.  We have said

---

[14]We have only petitioner's uncorroborated testimony regarding the sale.

that the startup phase of a horse-breeding activity may be 5 to 10 years. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). In 1976, petitioner bought his first parcel of real estate and built a small barn on it. Petitioner has been breeding Arabian horses since 1976.[15] One of petitioner's witnesses wrote a letter dated March 25, 1999, stating that he has known petitioner "through his reputation as a quality breeder for more than twenty years."

Petitioner argues that he lost money due to a depressed market during certain years. However, petitioner incurred consistent losses during the years 1986 through 1997. Those yearly losses ranged from $80,620 to $131,750 per year. Even when we consider the fact that petitioner reported gains from the sale of horses separately on Form 4797, petitioner's overall horse activities produced large consistent losses during each of the years 1986 through 1997.

According to testimony provided by one of petitioner's witnesses, the market for Arabian horses began to decline dramatically around 1985. Petitioner purchased his 78.5-acre farm in 1986. Petitioner spent substantial amounts of money refurbishing the house in which he lives and improving the

---

[15]Petitioner argues that he only "dabbled" in the industry prior to 1986. However, at trial, he could not recall whether a Schedule C, Profit or Loss From Business, relating to horse breeding was prepared with the earlier income tax returns.

property by building a lake, a three-car garage, exercise facility, barn stalls, and run-in sheds. These expenditures during a market decline are inconsistent with petitioner's assertion that circumstances beyond his control contributed to his losses.

The market for Arabian horses began to rebound in 1991 and 1992. Nevertheless, petitioner continued to sustain losses. During the market upswing, petitioner sold La Quintina for $2,000, Lucy in Disguise for $5,000, and Pro Gato for $47,500. Petitioner received $54,500 from the sale of these three horses, but he paid Mr. Dahart $22,500 in commissions.[16] Selling horses during a market upswing and paying 41.28 percent[17] in cumulative commissions when the standard commission was between 10 and 15 percent indicate that petitioner's activity was not engaged in primarily for profit.

Petitioner also argues that he lost several Arabian horses and that some of his horses experienced infertility problems. However, according to petitioner's own testimony, he has been very fortunate with regard to unexpected problems with his

[16]Petitioner also paid Stachowski Farms a $7,125 commission on the sale of Pro Gato. In combining the commission paid to Mr. Dahart and Stachowski Farms, petitioner paid a 55-percent commission on the sale of Pro Gato.

[17]The 41.28 percent does not include the $7,125 commission that petitioner paid Stachowski Farms in addition to the $19,000 commission paid to Mr. Dahart for the sale of Pro Gato.

horses. Indeed, from 1986 until May 1999, petitioner has lost only two foals. During the same period of time, petitioner lost only two mares, both from natural causes, with one dying of old age.

We are not convinced that petitioner incurred losses during the years in issue due to a depressed market or unforeseen problems. The losses petitioner incurred during the years in issue were consistent with his losses for all the years from 1986 through 1997.

(7) The Amount of Occasional Profits, if Any, Which Are Earned

Petitioner's activity has never been profitable. Petitioner admitted at trial that he will never be able to recoup what he has spent thus far.[18]

Petitioner asserts that he has sold several Arabians for substantial sums over the past several years. However, the occasional gain petitioner received from the sale of horses from 1986 through 1997 was de minimis compared to the expenses incurred, and as previously observed, petitioner's occasional opportunity to earn profits from the sale of horses was diminished by the extraordinary commissions paid to Mr. Dahart.

_____

[18]Petitioner attempted to mitigate the significance of this statement by asserting that he could more than recoup all his losses if he sold all the livestock, equipment, and the farm. But the farm includes petitioner's personal residence, and petitioner has never intended to sell the farm. He testified that his goal is to spend less time in medicine and more time on his farm and that he intended to retire on the property.

(8)  The Financial Status of the Taxpayer

At the time petitioner purchased the property in 1986, he had wage income of $156,461.  His income remained above the six-figure mark through 1997.  Petitioner's average wage income from 1986 through 1997 was $215,884.  During the years in issue, petitioner also earned $59,897 from University Imaging.  Petitioner was single, had a substantial income, and could afford to spend money on an activity that gave him enjoyment.

(9)  Elements of Personal Pleasure or Recreation

If the possibility for profit is small compared to the possibility for gratification, the latter possibility may be the primary motivation for the activity.  See White v. Commissioner, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955).

Petitioner's recreational objectives were a significant component of his horse-related activities.  Petitioner testified that when he was in college and trying to decide on a vocation, he told his father that he was considering becoming a school teacher.  According to petitioner, his father gave him the following advice:  "[I]f you ever want to have horses, you can't be a school teacher, you've got to find a job where you can make some money, be a doctor or a dentist".  Based on his father's advice, petitioner decided to go to medical school so that he could make a decent living and continue to do something with

horses, which he realized required a considerable amount of money.

Petitioner testified that his long-term goal was to produce English competition horses[19] that were capable of competing and winning at the national level in the English division and that could produce the same type of offspring. According to petitioner, he has been very successful in reaching his goal of producing horses that could successfully compete at the national level. He testified that his horses have won nine national championship honors. Petitioner testified that his ultimate goal is to retire from medicine young enough so that he is still able to work and participate in the management of his horses, ride them, compete with them, and eventually sell them.

Petitioner argues that his substantial time commitment and hard work eliminate any elements of pleasure or recreation. We recognize that the level of work or effort may indicate a profit objective and that caring for horses and maintaining a horse farm are hard work. However, the fact that an activity involves hard work does not, standing alone, establish that an activity was engaged in primarily for profit. Petitioner's introduction into horse breeding was precipitated by his love of horses, and he enjoyed his horse-related activity. Of course, the enjoyment of

---

[19]Arabian horses compete in English competition, which is a division of the competitions within the Arabian horse shows.

one's activity does not preclude a finding that the activity was engaged in primarily for profit, but it must be considered along with all the other facts.

Conclusion

Petitioner may have hoped to make a profit from his horse activity. However, in order to prevail, petitioner must show that his activity was engaged in primarily for the purpose of making a profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989); Godfrey v. Commissioner, 335 F.2d 82, 84 (6th Cir. 1964); Warden v. Commissioner, T.C. Memo. 1995-176. Based on petitioner's testimony, his long and consistent history of reporting losses without ever developing a business plan or detailed break-even analysis, and the manner in which he conducted his activity, we find that petitioner has not established that making a profit was his primary objective.

We hold that petitioner's activity was not engaged in for profit within the meaning of section 183(c). Petitioner's deductions of the losses associated with these activities are, therefore, subject to the limitations set forth in section 183(b).

Decision will be entered

for respondent.